**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

FLOVAC, INC.,

Plaintiff,

v.

AIRVAC, INC., ET AL.,

Defendants.

**Civil No. 12-1348 (SEC)**

**OPINION AND ORDER**

Before the Court are the defendants' summary-judgment motion, Docket # 108, the plaintiff's opposition thereto, Docket # 96, and the defendants' reply. Docket # 123. After reviewing the filings and the applicable law, this motion is **GRANTED**.

**Factual and Procedural Background**

Flovac, Inc. (Flovac), a manufacturer of vacuum sewer systems, brings this antitrust suit under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, against its competitor, Airvac, Inc. (Airvac) and its president, Mark Jones, charging them with conspiring to influence municipalities to issue specifications for vacuum sewer systems installation projects that favored Airvac's system, and by sending a letter misrepresenting Flovac's compliance with certain requirements. The complaint also asserts pendent and parallel local-law claims under Puerto Rico's antitrust statute, P.R. Laws Ann. tit 10, §§ 258, 260, and for tortious interference, P.R. Laws Ann. tit. 31, § 5141.

The Court recounts below the background leading up to the alleged antitrust violations, reserving for later discussion a more detailed dissertation of the facts pertinent to the analysis. In doing so, and whenever the parties quarrel over what occurred, the Court "adhere[s] to the plaintiff's version in keeping with . . . [its] role in reviewing" summary-judgment motions, Ahmed v. Johnson, 752 F.3d 490, 492 (1st Cir. 2014), assuming, of course, that those facts are neither inadmissible nor unsupported by the record.

I.

This action concerns sewer systems. Governmental entities like municipalities, but also land developers, use sewer systems to collect and treat wastewater from homes and buildings. Docket # 98 (SUF), ¶ 6. And they come in different varieties—"gravity sewer systems, grinder-pump low pressure sewer systems, septic tank effluent pump systems, and septic tank effluent gravity sewer systems," and, most relevant to this case, vacuum sewer systems—–but they are all used for the same purpose: Conveying wastewater from a source to an area for treatment. SUF ¶ 6. According to a July 2010 study by the Environmental Protection Agency (EPA), there are around 16,000 sewers systems in the US, the majority of which are gravity, Docket # 98-4, p. 6, and approximately 365 are vacuum sewer systems. SUF ¶ 9.

Airvac and Flovac are two corporations that manufacture, market, and sell vacuum sewer systems, SUF ¶ 1, and so are Iseki and Saksui. See Docket # 119, p. 17 (ASUF), ¶ 5. Neither Airvac nor Flovac, however, constructs vacuum sewer systems (that is done by general contractors); they merely sell equipment and manufactured goods essential to sewer systems, e.g., interface valves, valve pit components, vacuum pumps, and other vacuum station equipment. SUF ¶ 5.

Founded in 1968, Airvac is an Indiana corporation, and Mark Jones became its president in 1999, though he had worked there since 1992. ASUF ¶¶ 1-2. Airvac describes itself as "the world leader in vacuum sewer technology." Docket # 98-3, p. 2. And for good reason: Of the approximately 365 vacuum sewer systems in the US, 320 are Airvac's. SUF ¶ 9. The opposite is true of the greater sewer system market, however. Since 2004, Airvac has marketed vacuum sewer system technology for more than 750 different potential sewer system installations projects in the US; of those, it secured around 60, meaning that Airvac persuaded a municipality or engineer to install its vacuum sewer system less than 8% of the time. SUF ¶ 10. This is so, in part, because of our free market system. Before constructing or modifying a sewer system,

municipalities evaluate different types of sewer systems, including gravity, low pressure, and vacuum. SUF ¶ 7. Airvac's business and marketing strategy thus centers on convincing municipalities and design engineers to install vacuum sewer systems, rather than other sewer systems. SUF ¶ 17.

Flovac, a Puerto Rico corporation, is a newcomer in the vacuum sewer system business. It was founded in 2009 by Héctor Rivera, Flovac's sole owner and president. Docket # 119-47, p. 76; Docket # 1, V. ¶ 3. (Confusingly, "Flovac Inc.," the plaintiff, and "Flovac International," a Dutch corporation, are actually two different entities, the former being a "franchise" of the latter.) The nub of Flovac's complaint is that Airvac and Jones have hindered its attempts to "penetrate" the Puerto Rico and continental United States market for vacuum sewer systems. Docket # 1, V. ¶ 5. And the summary-judgment record, viewed in the light most favorable to Flovac, indeed shows that Airvac has proven to be a hardhearted competitor; but, as Judge Easterbrook once remarked, "a desire to extinguish one's rivals is entirely consistent with, often is the motive behind, competition." A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396, 1402 (7th Cir.1989).

In this venue, Flovac challenges Airvac's conduct in connection with five vacuum sewer system installations projects. SUF ¶ 24. But only the "Ingenio Project," located in Toa Baja, Puerto Rico, necessitates discussion. (Flovac's tortious interference claims concern only the Ingenio Project, whereas the other four projects relate only to the alleged antitrust violations, which as explained below, fail given Airvac's lack of market power; Airvac's conduct concerning these four projects is therefore irrelevant for present purposes.)

The Ingenio Project, one of the projects for which Airvac and Flovac competed, was commissioned by the Puerto Rico Aqueduct and Sewer Authority (PRASA), and it was partially funded with funds earmarked by the American Recovery and Reinvestment Act of 2009 (ARRA), Pub. L. No. 111-5, 123 Stat. 115. SUF ¶ 25. PRASA advertised the Ingenio Project

for bid on August 30, 2009, and although the project's specifications provided that Airvac "was used as the basis of design," they also stated that the would-be contractor could consider "other manufactures that comply with the requirement and intent of the drawing . . . ." SUF ¶ 29. Around this time, one of Airvac's Puerto Rico sales representatives told Jones that Flovac had been trying to enter the US market. Docket # 119-44, pp. 37-38. This sales representative also tipped off Jones that some of Flovac's vacuum sewer components had not been manufactured in the US. Docket # 124, ¶ 17.

As it happened, the winning bidder and contractor chose Flovac's vacuum sewer system over Airvac's. SUF ¶ 30. And Jones, dissatisfied with that outcome, wrote to PRASA on May 20, 2010, questioning Flovac's compliance with ARRA's "Buy American" requirements. Jones took issue with the valve of Flovac's vacuum sewer system, "because it [was] manufactured in the Netherlands." Docket # 89-14, p. 3. Jones also stated that Flovac could not meet the Ingenio Project's independent requirement "that all the main components of the sewer system must be purchased from the same manufacturer." SUF ¶ 34. Flovac's Rivera became aware of Jones's letter shortly after it was sent. And as soon as PRASA received the letter, it forbade the builder from "continu[ing] forward with the installation of the Flovac system," SUF ¶ 36, presumably while it investigated Jones's imputations.

PRASA wrote back to Jones in June, and essentially "sustained" its "position that [Flovac's] vacuum systems complied with the ARRA and the project's contractual requirements." Docket # 119-25, p. 2. Undeterred, Jones contacted the EPA, asking it "to investigate the concerns" just discussed. Docket # 119-26, p. 4. The EPA investigated Jones's claims, and "recommended" that Flovac manufacture the upper body component in Puerto Rico "[t]o make the substantial transformation process more complex." Docket # 98-6, pp. 16-17. And that is exactly what Flovac did; it began assembling and manufacturing, "by injection molding one sub-component of the valve," Docket # 98-6, p. 11, in Puerto Rico. Although the

EPA and other environmental agencies "supervised" the above process, the EPA never disqualified Flovac from participating in the Ingenio Project. Id.; Docket # 119, ¶ 37. This presumably infuriated Airvac, who had hoped to win this project. See ASUF ¶ 31. One of Airvac's representatives in Puerto Rico even referred to this whole matter as the "'Ingenio fraud case.'" ASUF ¶ 37.

Ultimately, Flovac resumed and completed the Ingenio Project, whose subcontract (which Flovac signed) provided for $3.02 million in compensation, Docket # 98-16, though it is unclear from the record whether Flovac actually received that whole amount. Rivera nonetheless testified in his deposition that the project's paralyzation, which according to Rivera, lasted for "about ten months," injured Flovac, because it was "paying [its] staff" but "not b[eing] paid." Docket # 98-6, pp. 5-6.

II.

On May 16, 2012, this antitrust action ensued. Docket # 1. The original discovery deadline was set for February 14, 2013, Docket # 15, and, at the parties' behest, extended until May 31, 2013. Docket # 17. Flovac then requested until October 31, 2013 to finish discovery, Docket # 55, and the Court granted this request. Docket # 65. At the December 18, 2013 conference, Flovac requested the reopening of the discovery; the Court reluctantly granted this request, pushing back the discovery cut-off date to February 17, 2014. Docket # 80. (Flovac was then admonished for violating a discovery order, Docket # 91, which forced the Court to push back the deadline one last time.)

In due course, the defendants moved for summary judgment, see Fed. R. Civ. P. 56, positing that because Flovac cannot show injury, they are entitled to summary judgment on all of its claims. Docket # 96, p. 1. As to Flovac's section 2 claims, the defendants contend that summary judgment is proper because Flovac (1) cannot prove that Airvac has market power in a defined relevant market; (2) falls short of establishing that the defendants' alleged misconduct

was exclusionary; and (3) marshals no evidence that the defendants' conduct injured competition. Those same three grounds, the defendants further argue, spell doom for Flovac's section 1 claims, and for its local-law antitrust claims. The defendants also say that the section 1 claims fail, as Flovac lacks evidence to show that the defendants entered into a conspiracy with any municipality or engineer to restrain trade. In addition, the defendants invoke the Noerr-Pennington doctrine, maintaining that their alleged efforts and purported misrepresentations are immune from antitrust liability. Lastly, Airvac avers that Flovac's tortious interference claims are time-barred, and that in any event cannot survive summary judgment on the merits.

Flovac opposed, maintaining that none of its claims can be summarily disposed of. Docket # 118. Oral argument was heard in January 2015. Docket # 135.

**Standard of Review**

Summary judgment is appropriate only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, it is axiomatic that courts "may not weigh the evidence," Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994), and yet must construe the record in the "light most flattering" to the nonmovant. Soto-Padró v. Public Bldgs. Authority, 675 F.3d 1 (1st Cir. 2012). A court must similarly resolve all reasonable inferences in favor of the non-moving party. Tolan v. Cotton, 134 S.Ct. 1861, 1863 (2014) (per curiam).

Once the moving-party properly constitutes a summary-judgment motion, the burden shifts onto the nonmovant—or "the party who bears the burden of proof at trial," Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014)—to "point to competent evidence and specific facts to stave off summary judgment." Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011). "If the evidence is merely colorable, or is not significantly probative," the Supreme Court has instructed, "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (internal citations omitted). So the nonmovant cannot rest on conclusory allegations and improbable inferences.

Shafmaster v. U.S., 707 F.3d 130, 135 (1st Cir. 2013); neither "effusive rhetoric," Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997), nor "arguments woven from the gossamer strands of speculation and surmise," RTR Technologies, Inc. v. Helming, 707 F.3d 84, 93 (1st Cir. 2013), suffice to forestall the entry of summary judgment. Failure to shoulder this burden "allows the summary judgment engine to operate at full throttle." Lawton v. State Mut. Life Assur. Co., 101 F.3d 218, 223 (1st Cir. 1996).

**Applicable Law and Analysis**

*Federal Antitrust Claims*

As noted, Flovac asserts conspiracy claims under § 1 of the Sherman Act, which prohibits conspiracies in restraint of trade. 15 U.S.C. § 1. Flovac explicitly cabins its § 1 claims under the so-called "rule of reason," Docket # 118, p. 11, and therefore makes no claim that any agreement in this case falls under the so-called "per se" category. See generally NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 133-36 (1998) (discussing per se rule). Flovac also claims violations of § 2, which forbids monopolization or attempt to monopolize "any part" of commerce, as well as conspiracies and combinations to monopolize. 15 U.S.C. § 2.

Of particular importance to this case, both claims under § 1 (at least those analyzed under the rule of reason) and § 2 require a threshold finding of market power. E.g., Diaz Aviation Corp. v. Airport Aviation Servs., Inc., 716 F.3d 256, 265 (1st Cir. 2013); see also George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547, 550 (1st Cir.1974) (extending market-power requirement to attempted-monopolization claims). (A monopolization that violates § 2 necessitates "an initial determination that the defendant has monopoly power—a high degree of market power." William M. Landes & Richard A. Posner, Market Power in Antitrust Cases, 94 Harv. L. Rev. 937 (1981).) Market power is a would-be monopolist's ability to profitably charge more than the competitive price for a prolonged time; or, as Judge Posner puts it, "the power to raise price above the competitive level without losing so much business

to other sellers that the price would quickly fall back to that level . . . ." In re Sulfuric Acid Antitrust Litig., 703 F.3d 1004, 1007 (7th Cir. 2012).

Determining market power mandates defining the relevant market, Springfield Terminal Ry. Co. v. Canadian Pac. Ltd., 133 F.3d 103, 107 (1st Cir. 1997), which has two aspects: A product market and a geographic market. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993); Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 197 (1st Cir. 1996). Here, Flovac alleges that the geographic market comprises Puerto Rico and the mainland US. And the defendants (quite wisely so) do not quarrel with Flovac's proposition, so the inquiry zeroes in on whether Flovac has presented sufficient evidence of a relevant product market.

The relevant product market, the Supreme Court made clear over 50 years ago, is comprised of products that are considered by consumers to be "reasonabl[y] interchangeab[le]" with what an antitrust defendant sells. Eastman Kodak Co. v. Image Tech'l Servs., Inc., 504 U.S. 451, 482 (1992); Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962); United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 394 (1956). This analysis is twofold. One must first consider not only the product in play (vacuum sewer systems), but the reasonable substitutes accessible to consumers; that is, the products with which Airvac's vacuum sewer systems effectively competes. Then, the inquiry focuses on "[t]he extent to which consumers will change their consumption of one product in response to a price change in another; i.e., the 'cross-elasticity of demand.'" Kodak, 504 U.S. at 469. A high cross-elasticity of demand usually means that products are substitutes, while the opposite indicates that the products are not substitutes and, consequently, compete in different markets. See, e.g., id.

In short, if "there are market alternatives that buyers may readily use for their purposes," the Supreme Court has said, "illegal monopoly does not exist." E. I. du Pont, 351 U.S. at 391. It bears emphasis that these determinations are made from the consumer's perspective—here

the municipalities. George R. Whitten, Jr., Inc., 508 F.2d at 551 ("By necessity, definition of 'market' must also focus on attitudes and reactions of consumers.").

Flovac's complaint alleges the same relevant product market for its § 1 and § 2 claims: Vacuum sewer systems. So the same market analysis applies for both claims. See Fraser v. Major League Soccer, L.L.C., 284 F.3d 47, 61 (1st Cir. 2002). And no one disputes that if Flovac's proposed relevant product market were accepted, Airvac would have both market power and monopoly power, because its share of that market exceeds 87%, far above the well-recognized threshold. See, e.g., United States v. Aluminum Co. of America, 148 F.2d 416, 424 (2d Cir.1945) (L. Hand, J.) (more than 50% of market share is required for inferring monopoly power); cf. Grappone, Inc. v. Subaru of New England, Inc., 858 F.2d 792, 797 (1st Cir. 1988) ("If the fact that Jefferson Parish Hospital received 30 percent of all hospital patients living in East Jefferson Parish did not show market power, it is difficult to see how these far smaller figures could show the contrary here.").

But in their summary-judgment motion, the defendants have come forward with sufficient competent evidence to pierce the pleadings, and thereby show that the relevant product market comprises others sewer systems "that are strong competitors with and provide interchangeable alternatives to vacuum sewer systems." Docket # 97, p. 13. The summary-judgment record makes manifest, and Flovac so concedes, that (1) all sewer systems are used for the same purpose: To transport wastewater from a source to a treatment facility, SUF ¶ 2; (2) before deciding to buy vacuum sewer systems, municipalities also consider gravity and low pressure sewer systems, SUF ¶¶ 6-8; and (3) Airvac has constantly faced competition with other kinds of sewer systems. SUF ¶ 10. And Flovac also concedes, as it must, that if "the analysis is made using" the defendants' proposed product market, "then clearly the 2% of the sewer system market would apply," Docket # 118, p. 13, and Airvac would "not have market power." Id. at 12; accord, e.g., A.I. Root Co. v. Computer/Dynamics, Inc., 806 F.2d 673, 675 (6th Cir. 1986) (2-4% deemed insufficient to achieve market power).

These uncontested facts, the defendants correctly argue, Docket # 123, p. 9, suffice to meet their initial burden of demonstrating the absence of a genuine issue of material fact that the nonmovant (Flovac) "will be unable to carry its burden of persuasion at trial," Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)) of proving that the relevant product market encompasses only vacuum sewer systems. Of course, Flovac bears the ultimate burden of establishing the relevant market, e.g., Town of Concord, Mass. v. Boston Edison Co., 915 F.2d 17, 32 (1st Cir. 1990) (Breyer, J.), and at the summary-judgment stage it must "present sufficient evidence from which a reasonable jury could find the existence of the proposed relevant market." Coastal Fuels of Puerto Rico, Inc., 79 F.3d at 197. So now the burden shifts onto Flovac to "point to competent evidence and specific facts to stave off summary judgment," Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011), by creating a triable issue about why other kinds of sewer systems should be excluded from the relevant product market. Summary judgment is, after all, "the put up or shut up moment in litigation." Jakobiec v. Merrill Lynch Life Ins. Co., 711 F.3d 217, 226 (1st Cir. 2013) (citation and internal quotation marks omitted). But Flovac falls short of shouldering this burden.

As an initial matter, Flovac has come forward with no competent economic evidence in support of its theory that the relevant product market is limited to vacuum sewer systems. Although, contrary to other circuits, e.g., Bailey v. Allgas, Inc., 284 F.3d 1237, 1246 (11th Cir. 2002), the First Circuit does not appear to have decided whether a plaintiff must produce expert testimony to prove a relevant product market, it has intimated so, see U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 599 (1st Cir. 1993) (Boudin, J.) ("In practice, the frustrating but routine question how to define the product market is answered in antitrust cases by asking expert economists to testify."). And that is unsurprising, for common sense suggests that expert testimony, if favorable of course, would aid an antitrust plaintiff in its quest to establish a

proposed (and narrow) relevant product market. See, e.g., Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 762 F.3d 1114, 1120 (10th Cir. 2014) ("From Dr. Chewning's testimony, a fact-finder could reasonably infer a low or zero cross-elasticity of demand between hand tools and bone mills."). Yet Flovac never retained an expert.

Be that as it may, an antitrust plaintiff facing a properly configured summary-judgment motion, like Flovac is, must still marshal competent "adequate evidence to establish a genuine issue of material fact." Davric Maine Corp. v. Rancourt, 216 F.3d 143, 146-47 (1st Cir. 2000) (so holding in the antitrust context). And because defining the relevant market is, at bottom, a "key economic question," DSM Desotech Inc. v. 3D Sys. Corp., 749 F.3d 1332, 1342 (Fed. Cir. 2014), it stands to reason that Flovac must introduce some type of economic evidence, even if not done through an economic expert. See Diaz Aviation Corp., 716 F.3d at 265 ("Rule of reason analysis typically requires a plaintiff to show that the defendants' actions enhanced market power . . .[,] which in turn requires some economic analysis of the relevant market." (emphasis added) (citing E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Assoc., Inc., 357 F.3d 1, 5 (1st Cir. 2004))); see also George R. Whitten, Jr., Inc., 508 F.2d at 554 (affirming summary-judgment because of lack of "evidence that pipeless systems cater to a discrete class of consumers"). Flovac could have, for instance, sought discovery from the municipalities (the consumers) about whether they viewed the different types of sewer systems as having different "utility, efficiency, reliability, responsiveness, and continuity," Grinnell Corp., 384 U.S. at 574, yet it chose not to, which is unsurprising given its "lackadaisical approach to discovery." Docket # 80, p. 1. Nor did Flovac provide evidence concerning "the effect on pricing or output, or other relevant economic variables." Diaz Aviation Corp., 716 F.3d at 265; see also, e.g., U.S. Healthcare, Inc., 986 F.2d at 599 ("Usage patterns, customer surveys, actual profit levels, comparison of features, ease of entry, and many other facts are pertinent in answering the question.").

With these critical shortcomings in mind, the inquiry focuses on the evidence that Flovac did introduce. Flovac marshals two pieces of evidence on this front, but none suffices "to deflect the swing of the summary judgment scythe." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).

First, Flovac vouchsafes a lone assertion from an undated affidavit by its president, Héctor Rivera, that "[v]acuum sewer systems as a particular technology [are] more suitable for particular geographical and topographical areas than gravity or other technologies." Docket # 119-42, ¶ 3. But because Rivera's affidavit is undated, it violates 28 U.S.C. § 1746. More importantly, such "vague and conclusory statements in an affidavit," the defendants correctly point out, "do not meet the specificity requirement of Federal Rule 56." Posadas de Puerto Rico, Inc. v. Radin, 856 F.2d 399, 401 (1st Cir. 1988); see also, e.g., Cordero-Soto v. Island Fin., Inc., 418 F.3d 114, 120 (1st Cir. 2005). This is especially true here because Rivera's affidavit conveniently omits defining these "geographical and topographical areas." But even putting those flaws aside, Rivera's opinion, which of course represents Flovac's opinion, is insufficient as a matter of law to establish a proposed relevant product market. See Flegel v. Christian Hosp., 4 F.3d 682, 690 n. 7 (8th Cir. 1993) ("The plaintiffs' perspective on the market has no bearing."); accord Winter Hill Frozen Foods & Servs., Inc. v. Haagen-Dazs Co., 691 F. Supp. 539, 546 n. 12 (D. Mass. 1988) (holding, in dicta, that affidavit of plaintiff's principal was "insufficient to establish a distinct market for super premium ice cream").

Second, and in a clear attempt to provide some heft to Rivera's otherwise vague declaration, Flovac asserts in its memorandum, but not in its opposing statement, that "if the Court reviews" Airvac's projects, "it is axiomatic" that vacuum sewer systems are "more suitable for certain geographical areas than others." Docket # 118, p. 13. Flovac then goes on to say that, as of 2009, Airvac had "54 projects" in Florida; "38" in Indiana; "26" in Virginia; and "20" in North Carolina. Id. (citing Docket # 119-40). But this amounts to nothing more than smoke and mirrors.

As a threshold matter, this "evidence" manifestly violates the anti-ferret rule, because Flovac never included it in its opposing or additional statement of material facts, as required by Local Rule 56(c); nor did it cite to the "specific page" of this exhibit. So it is disregarded. Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 31 (1st Cir. 2010); see also Nievesv. Univ. of P.R, 7 F.3d 270, 280 (1st Cir. 1993) ("[A] party may not generate a trial-worthy dispute at summary judgment merely by presenting unsubstantiated allegations in its memoranda."). At any rate, this proffer explains neither why nor how vacuum sewer systems are more suitable in these areas; and even assuming that it did, it sheds no light on what these areas share in common that would exclude the other kinds of sewer systems. But even more fundamentally, Flovac offers zero evidence that consumers in areas "more suitable" for vacuum systems do not consider gravity or pressure systems to be "reasonably interchangeable" with vacuum systems; nor does it marshal any evidence that consumers in these "more suitable" areas do not view vacuum systems as close substitutes.

The upshot is that Flovac's cumulative evidence is, at most, colorable. But "[i]f the evidence is merely colorable, or is not significantly probative," the Supreme Court has instructed, "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (internal citations omitted). And where, as here, an antitrust plaintiff neglects to "define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient." City of New York v. Grp. Health Inc., 649 F.3d 151, 155 (2d Cir. 2011) (citations and internal quotation marks omitted). The defendants are therefore entitled to summary judgment, because Flovac—who concedes that sewer vacuum systems compete with the other types of sewer systems, Docket # 119, ¶¶ 7,10—falls miles short of creating a triable issue about why the other types of sewer systems are not viable substitutes for Airvac's vacuum sewer systems. Cf. IGT

v. Alliance Gaming Corp., 702 F.3d 1338, 1344 (Fed. Cir. 2012) (affirming summary judgment where plaintiff had failed to raise a triable issue that other types of gaming machines were not a viable substitute for defendant's machine, and had also conceded that defendant's machine competed with other types of machines from the consumer's perspective). No reasonable jury could therefore find in favor of Flovac's proposed product market, and this complete lack of competent evidence compels a grant of summary judgment to the defendants.[1]

"Antitrust claims often rise or fall on the definition of the relevant market." Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 345 (8th Cir. 1995). So too here. Because vacuum sewer systems are not a market, Airvac is not a monopolist of vacuum sewer systems. Flovac having therefore failed to meet this threshold requirement, the Court need not consider the defendants' other defenses concerning the alleged exclusionary conduct. See Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 65 F.3d 1406, 1413 (7th Cir.) (Posner, J.) ("Since monopoly power was not proved, we need not evaluate the practices by which the Clinic acquired or maintained it."), as amended on denial of reh'g (1995).

One last point. "[I]f there is any case in which counsel has the obligation to cull the record, organize the facts, and present them in the framework of a persuasive legal argument, it is a sophisticated antitrust case like this one." U.S. Healthcare, Inc., 986 F.2d at 599.Yet Flovac apparently turned a deaf ear to that admonition. Although the Court granted its request

---

[1] At oral argument, Flovac appeared to change gears, advancing, for the first time, a theory that vacuum sewer systems are a submarket of all sewer systems. That theory is hopeless. For one thing, "an argument raised for the first time at a hearing . . . is not properly before the Court." Stockler v. Reassure Am. Life Ins. Co., No. 11-15415, 2013 WL 866486, at *8 (E.D. Mich. Mar. 7, 2013) (citing cases to that effect). For another, that theory was adverted to in a wholly perfunctory matter (Flovac neither applied nor discussed the Brown Shoe factors, 370 U.S. at 325), so it is deemed waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990). And in any event "the requirements for pleading a submarket are no different from those for pleading a relevant broader market," PSKS, Inc. v. Leegin Creative Leather Products, Inc., 615 F.3d 412, 418 (5th Cir. 2010); see also F.T.C. v. Whole Foods Mkt., Inc., 548 F.3d 1028, 1058-59 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (explaining why recent caselaw cast doubt on the continued vitality of Brown Shoe).

to reopen discovery, Flovac took little advantage of that opportunity, neglecting to conduct any meaningful discovery to support its proposed relevant (and exceedingly narrow) product market. It also failed to file certified English translations of its Spanish-language exhibits, Dockets # 106, 114. Most frustratingly, its analysis of the relevant product market consisted of two paragraphs, Docket # 118, pp. 12-13; it never requested leave to file a surreply to the defendants' devastating reply on that front; and its additional statement of material facts contained no facts in support of its proposed relevant market.

*Pendent Claims*

As noted, Flovac challenges the same alleged monopolistic conduct under Puerto Rico's antitrust statute, P.R. Laws Ann. tit 10, §§ 258, 260, and asserts that the defendants tortiously interfered with the Ingenio Contract based on Jones's letter to PRASA. See Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc., 780 F.2d 1077, 1081-82 (1st Cir.1986) (discussing the four elements of tortious interference claims under Puerto Rico law). For the reasons laid out below, the defendants are right that Flovac's pendent local-law claims cannot survive summary judgment.

The local antitrust claims require little discussion. Inasmuch as Puerto Rico's antitrust statute has been deemed "coextensive" with the Sherman Act, Flovac's parallel and identical claims under Puerto Rico law must suffer the same outcome: Dismissal. See Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc., 332 F.3d 6, 16 (1st Cir. 2003); accord Pressure Vessels P.R. v. Empire Gas P.R., 1994 P.R.-Eng. 909, 547, 137 P.R. Dec. 497, 509-14 (1994); Ramallo Bros. Printing v. El Dia, Inc., 392 F. Supp. 2d 118, 143 (D.P.R. 2005). No more is needed to jettison these claims.

As to the tortious interference claims, the defendants argue, among other grounds that need not be considered, that those claims are time-barred. Docket # 97, p. 17. Because Flovac found out about Jones's May 20, 2010 letter to PRASA shortly after its delivery, and because

Flovac waited until May 16, 2012 to file suit, the defendants maintain that the tortious interference claims are barred by the applicable one-year statute of limitations. Id.

Flovac can forestall the entry of summary judgment only by showing that genuine issues of material fact exist about whether its tortious interference claims were "filed within the limitations period," Santana-Concepción v. Centro Médico del Turabo, Inc., 768 F.3d 5, 9 (1st Cir. 2014), which, under the applicable Article 1868(2) of the Civil Code, P.R. Laws Ann. tit. 31, § 5298(2), is one year. See, e.g., Sterling Merch., Inc. v. Nestle, S.A., 546 F. Supp. 2d 1, 2 (D.P.R. 2008) (reiterating that tortious interference claims are actionable under Puerto Rico's general tort statute, which borrows Article 1868(2) one-year limitations period). Flovac concedes that Jones's letter was "the trigger," Docket # 118, p. 28, but argues, in an obvious effort to soften the bite of the defendants' reasoning, that the limitations period "continued to be extended" until May 16, 2011. Id. "[T]here were acts occurring well into 2011," goes the argument, that allow Flovac "to claim" that its injuries "passed well [sic] May 16, 2011." Id. So Flovac, in other words, invokes the so-called continuing damages doctrine. And in support of this argument, Flovac offers a March 17, 2011 letter, in which the Ingenio Project's contractor wrote to PRASA to complain about PRASA's alleged "decision to not use [Flovac] valves any longer." Id. (citing Docket # 119-41). Flovac also furnishes an assertion from Rivera's affidavit that Airvac's "intervention provoked the delay of the [Ingenio Project] after the summer of 2011." Docket # 119-42, p. 3. This argument goes nowhere.

The short of it is that Flovac's reliance on the continuous damages doctrine, the defendants' aptly point out, actually reinforces their statute-of-limitations defense. This is because "[i]n continuing damages cases, as in other tort actions in Puerto Rico, the statute of limitations commences when the plaintiff has knowledge of the injury and the author of the damage." Cruz Vargas v. R.J. Reynolds Tobacco Co., 218 F. Supp. 2d 109, 115 (D.P.R. 2002) (citation omitted), aff'd sub nom. Cruz-Vargas v. R.J. Reynolds Tobacco Co., 348 F.3d 271 (1st

Cir. 2003); Mullins v. Dep't of Labor, 608 F. Supp. 2d 245, 254 (D.P.R. 2009). "The determining factor," the Puerto Rico Supreme Court has made clear in this context, "is the moment when occurrence of the damage begins, and that should be considered the starting point for the limitations period, assuming that the aggrieved parties were aware of the damage as of that moment and that they could have instituted a cause of action." Galib Frangie v. El Vocero de P.R., P.R. Offic. Trans, 138 P.R. Dec 560, 575 (1995). So even assuming, dubitante, that Flovac's tortious interference claims fall under the purview of this doctrine, the same result obtains.[2] For the record makes manifest, and Flovac so concedes, that Jones's May 20, 2010 letter to PRASA provoked the Ingenio Project's immediate halt, which in turn caused Flovac its alleged damages. SUF ¶ 36.

It thus follows, without serious question, that in June 2010, Flovac already had actual knowledge of this injury, and "of the identity of the author of the injury," Alejandro-Ortiz v. Puerto Rico Elec. Power Auth., 756 F.3d 23, 27 (1st Cir. 2014). The statute of limitations on Flovac's tort claims, then, had run by June 2011; and this suit, filed on May 16, 2012, was therefore irrefragably late. No more is needed to conclude that Flovac's tortious interference claims are time-barred. So the defendants are also entitled to summary-judgment on the tortious interference claims.

---

[2]Because Flovac never filed a certified English translation of the March 17, 2011 letter, which is in Spanish, the Court cannot consider it. E.g., González-De-Blasini v. Family Dep't, 377 F.3d 81, 89 (1st Cir. 2004). And the only case cited by Flovac in support of its argument, Santiago v. Rios Alonso, 56 P.R. Dec. 181 (2002) is also in Spanish; but Flovac provided no certified English translation of that case, so the Court is similarly precluded from considering it. E.g., Puerto Ricans For Puerto Rico Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008). Rivera's perfunctory assertion that Flovac's damages continued until the summer of 2011, moreover, violates the sham affidavit rule, see, e.g., Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 110-11 (1st Cir. 2006), because it contradicts his earlier deposition testimony that the delay provoked by Jones's letter lasted for "about ten months," Docket # 98-6, p. 6, i.e., until April 2011—at the latest. These procedural issues also spell doom for Flovac's last-ditch attempt to save its tortious interference claims.

**Conclusion**

For the reasons stated, the defendants' motion for summary judgment is **GRANTED**, and this case is **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 6th day of February, 2015.

*s/ Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge